**Alphonso DAVIS, Appellant,**

**v.**

**STATE of Missouri, Respondent.**

**No. 58343.**

Supreme Court of Missouri,
Division No. 1.

Nov. 12, 1974.

Motion for Rehearing or to Transfer to Court En Banc Denied Dec. 16, 1974.

Hampton Tisdale, Boonville, for appellant.

John C. Danforth, Atty. Gen., Jefferson City, Charles B. Blackmar, Sp. Asst. Atty. Gen., St. Louis, for respondent.

HIGGINS, Commissioner.

Appeal from denial, after evidentiary hearing, of motion under Rule 27.26, V.A. M.R., to vacate and set aside judgment and sentence to 99 years' imprisonment for forcible rape.

On June 4, 1956, Alphonso Davis pleaded guilty to forcible rape, Section 559.260, V. A.M.S., in the Circuit Court of Cooper County, the Honorable Dimmitt Hoffman, Judge, and received the sentence in question. He also pleaded guilty to other charges of armed robbery, breaking jail, and grand larceny for which he received varying sentences to run concurrently with the sentence imposed on the rape charge.

On September 15, 1966, Alphonso Davis filed a motion under Rules 27.25 and 27.26, V.A.M.R., attacking this judgment and sentence, asserting coerced confession, inadequate assistance of counsel, improper conduct of court, and lack of preliminary hearing as grounds for relief. A hearing was accorded June 7, 1967, after which the motion was overruled, and the judgment was affirmed. State v. Davis, 438 S.W.2d 232 (Mo.1969).[1]

---

1. Among other things, it was determined that the record supported findings that defendant voluntarily and without coercion made a signed written confession, that the nature of charges against defendant was adequately explained to him, that he understood the explanation and knew what he was doing, that he voluntarily and without fear or coercion entered a plea of guilty to the charge of rape, and that he had effective assistance of legal counsel.

Subsequently, movant petitioned for federal habeas corpus and the writ was denied on its merits. Davis v. Swenson, 308 F. Supp. 635 (W.D.Mo.1970).

Movant petitioned for federal habeas corpus a second time, asserting, among other grounds, that "he was mentally incompetent at the time of his plea and sentencing." The district court, by memorandum and order April 28, 1971, denied the other grounds but dismissed the petition without prejudice as to the quoted ground "for failure to exhaust state court remedies which are presently available."

On August 5, 1971, movant filed his second motion under Rule 27.26 alleging, among other grounds for relief, that he was incompetent at the time of sentencing and was denied his right to a hearing on that issue in violation of his constitutional rights. A hearing was accorded March 31, 1972, after which, on April 24, 1972, the motion was denied; and an appeal was taken from this ruling. While it was pending, Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), was decided, and appellant requested leave of this court to amend his second motion to assert, as additional grounds for relief, that his guilty plea was induced by fear of the death penalty and that it was involuntary and in violation of his constitutional rights because it was entered to avoid cruel and unusual punishment.

On January 29, 1973, this court overruled the motion to amend; and reversed the judgment of April 24, 1972, and remanded the cause, pursuant to agreement of the parties, to accord appellant an opportunity to amend his motion of August 5, 1971, and present such point in the trial court.

On April 20, 1973, the proposed amendment was accomplished. A second hearing was accorded May 8, 1973, after which the motion again was denied, and this appeal ensued.

The following statement is taken from appellant's briefs.

The complaint was filed against Davis in the Magistrate Court of Cole County, Missouri, on February 7, 1956, charging him with forcible rape. He waived preliminary hearing and was bound over to the Circuit Court of Cole County.

On March 30, 1956, attorney Edgar M. Eagan was appointed to represent Davis, and, after conferring with him, filed a motion on April 9, 1956, to have a mental examination made of Davis. The docket sheet does not show that Judge Sam C. Blair ever made an order for the examination of Davis or that any action was ever taken on the motion; however, by letter of April 24, 1956, to Mr. Eagan, Judge Blair acknowledged notice of the motion and recited his request to the warden to secure the examination by Dr. Guhleman and to file written report with the court.

A mental examination of Davis was made by Dr. Henry Guhleman which resulted in a written report addressed to Judge Blair. The Guhleman report was dated May 7, 1956, and shows that it was received in the warden's office at the penitentiary on May 8, 1956. On the preceding day, May 7, 1956, Davis was granted a change of venue to the Circuit Court of Cooper County, Missouri. Mr. Eagan had a copy of the report but did not discuss the matter further with Judge Blair.

The docket sheet of the Circuit Court of Cooper County shows that the change of venue transcript from Cole County was received and filed May 9, 1956. This transcript contained the motion for the mental examination previously filed in the Cole County Circuit Court which became a part of the court file in Cooper County. The docket sheet of the Circuit Court of Cooper County does not show that the Guhleman report was ever filed.

The appellant entered a plea of guilty in the Circuit Court of Cooper County on June 4, 1956. Nothing was said by the prosecuting attorney or appellant's counsel about the Guhleman report to the Honorable Dimmitt Hoffman, the trial judge.

Judge Hoffman did not ask Davis if he had been examined by a doctor. Mr. Eagan does not recall that there was any discussion of the Guhleman mental examination report with Judge Hoffman.

Judge Dimmitt Hoffman, the trial judge, and Roy Snyder, official court reporter, are now deceased, and there is no record or transcript of the testimony before Judge Hoffman at the time the plea was entered and sentence imposed, and there is no record of the conversation that took place between the judge, counsel, and Davis.

Davis quit school at the fourth grade. While living in St. Louis he was hospitalized, and was dizzy and blacked out. He was a patient at Homer Phillips Hospital and at Barnes Hospital. Davis had a psychiatric examination because of his conduct at age 8 or 9 years While an inmate at Algoa, Davis was given an intelligence test showing an I. Q. of 50.

Davis was confined in "death row" at the penitentiary for a month prior to entry of his plea. He became upset with his treatment by the guards and thinks there was a change in his condition. His nerves were on edge and he could not think. Davis was told the prosecuting attorney said he would try to get Davis in the gas chamber.

James W. Stidham, another inmate, talked with Davis in death row. Davis went berserk and guards shot water from a fire hose on him and beat him up. Davis appeared mentally irrational a majority of the time. Stidham could hear Davis hollering. He seemed mentally sick from the time he first came into death row and never showed any improvement and was not fully coherent.

Gene Barnes, inmate foreman at the rock quarry at Algoa, was Davis's boss. Davis could not do his job right. He was a victim of perverted sex acts. He regarded Davis as more or less mentally incompetent. Davis could not do simple tasks. Davis appeared like a little child, and Barnes did not know if he would be ra-

tional or irrational. He was always in distress because all of the men on the rock pile were misusing him. He was in a lot of fights as a result of not wanting to participate in sexual acts and being forced to do so.

Davis insists that he was taken to the office of James T. Riley, then prosecuting attorney of Cole County, on February 8, 1956, where he was viewed by the lady he was alleged to have raped. She was asked in his presence if Davis was the one who raped her. She first did not know, but after assurances by the prosecuting attorney that Davis was in custody and couldn't do any harm, the lady then said Davis had raped her. At that time, Davis further testified that the prosecuting attorney threatened him with the gas chamber, using the exact words, "I am going to try to get you to the gas chamber." Judge Riley denied that this conversation took place.

Edgar M. Eagan, Davis's court-appointed counsel, advised Davis in April, 1956, that the offense of rape carried the death penalty. At the time Davis was confined in death row at the penitentiary, which is the cell for condemned felony inmates going to the gas chamber, Davis was apprehensive and in fear he might get the gas chamber if tried, and he talked to his lawyer about it. Mr. Eagan discussed with Davis the case of State v. William Porter, Case No. 3721, in which the defendant was sentenced to death by Judge Blair on a plea of guilty in 1952. Davis told his lawyer he would be willing to enter a plea of guilty on the condition that the death penalty was not asked by the prosecuting attorney.

In the conversation between Eagan and the prosecuting attorney, the State was insisting on the death penalty for Davis. The principal objective of Davis and his attorney was to avoid the death penalty. Mr. Eagan conferred with the prosecuting attorney on Saturday, June 2, 1956, two days before the plea of guilty was entered by Davis on June 4, 1956, in the Circuit Court of Cooper County.

The prosecuting attorney agreed not to ask for the death penalty if a guilty plea was entered. This was told to Davis and Davis stated, "That's the best news I have ever had in my life."

Mr. Eagan first learned of the recommendations to be made by the prosecuting attorney as to the length of sentences in the various cases pending against Davis, and whether said sentences were to run consecutively or concurrently, in the courtroom on June 4, 1956. He knew only that the death penalty would not be asked on the rape charge. Judge Riley disagrees on this point and states that he advised Mr. Eagan that his recommendations on the rape charge would be 99 years on a plea of guilty.

It was the death penalty that caused Davis to enter his plea of guilty. He knew that the recommendation of the prosecuting attorney was to be a sentence of 99 years when he entered his plea. Davis stated he did not stand trial because he had no witnesses and no chance, and the statement he made was forced. He further stated that he did not commit the rape. Mr. Eagan does not recall whether Davis ever expressly admitted the rape in court at the time of his guilty plea. The court at the time of the entry of said plea did not ask Davis the ultimate question as to whether in fact he raped the woman.

To this should be added the following from respondent's brief.

Davis had no change in his ability to think, reason, understand or comprehend while he was confined before trial. He understood the charges facing him and understood he was going to be punished.

The prosecuting attorney, now Judge Riley, believed the appellant understood the charges against him. Davis's attorney stated that Davis understood the charges and the range of punishments.

The judge at the time Davis pleaded guilty explained each of the charges to Davis and asked Davis if he understood the charges. Davis had no difficulty in communicating with his attorney. Mr. Eagan, the attorney for Davis, believed Davis understood the charges against him.

The doctor who accorded appellant's mental examination concluded that Davis was capable of aiding his attorney in his own defense. The doctor last saw Davis on May 3, 1956. The last time witness Barnes saw Davis before appellant pleaded guilty was in February, 1956. Witness Stidham's last observations of Davis before his plea was on April 1, 1956.

Davis agreed with his attorney to plead guilty two days before he did so, after learning of the doctor's report on his competency. Mr. Eagan, attorney for Davis, discussed the charges and their severity with Davis and learned of Davis's background. Davis had given a voluntary confession to the police. Mr. Eagan interviewed an extensive number of witnesses, and discussed the case numerous times with Davis. Eagan asked for a change of venue and sought a mental examination for Davis.

Mr. Eagan's reason for asking for a mental examination was to find grounds to assert a defense of insanity as to the charges against Davis, not because there was any doubt as to appellant's competency to stand trial.

Appellant contends (I) that he was incompetent to stand trial at the time of his guilty plea and sentencing, and the failure of the trial court to consider defendant's mental competency to stand trial and to hold a separate hearing thereon violated his constitutional right to due process.

Appellant argues, relying primarily upon Pate v. Robinson, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), and Brizendine v. Swenson, 302 F.Supp. 1011 (W.D.Mo. 1969), that the "undisposed of" motion for mental examination of defendant "should have raised a flag of warning to the Trial Judge and prompted him to forthwith make an inquiry" leading to a determination of

defendant's sanity. He argues also that if the trial judge had examined the file and made inquiry, or if counsel had called the report to the court's attention, the judge would have discovered the additional signs of defendant's low I. Q., drug addiction, and other problems.

These arguments are made despite the psychiatric examination accorded defendant by Dr. Guhleman and the existence of the report, available at the least to defense counsel, of such examination finding that defendant knew the difference between right and wrong at the time of his offense and that he was capable of helping in his own defense. In addition to the evidence furnished by Dr. Guhleman, which is contrary to appellant's position, the testimony of Mr. Eagan and Judge Riley, also contrary to appellant's position, must be set against the testimony of witnesses Stidham, Barnes, and movant himself; and deference must be given to the trial court's resolution of conflicts in such evidence. Rule 27.26, supra.

The question under appellant's Point I is whether, in the circumstances of this case, the trial court should have held a hearing, *sua sponte,* to determine the competency of defendant to enter his guilty plea.

This question has been ruled a number of times since the decisions in Pate v. Robinson and Brizendine v. Swenson, supra, and such subsequent rulings support the trial court in the denial of relief to movant on this ground.

In the first place, both of appellant's authorities are distinguishable. In Pate v. Robinson, the defendant was experiencing hallucinations and was an attempted suicide. His attorney argued to the court throughout the proceedings that defendant's competency and sanity were suspect. Such circumstances should have created a *bona fide* doubt in the mind of the trial court as to require a hearing on defendant's competency. In Brizendine v. Swen-

son, there was evidence that defendant was a drug addict and an alcoholic and unable to comprehend questions from his counsel or to understand the charge against him. Coupled with this was defense counsel's apparent unawareness of the law of mental responsibility available to defendant which suggests that the case was one of ineffective assistance of counsel as much as a failure to accord a competency hearing. Similarly, in Hansford v. United States, 124 U.S.App.D.C. 387, 365 F.2d 920 (1966), drug withdrawal symptoms were present in defendant during proceedings against him.

By contrast, there is evidence in this case to show that defendant understood the charges against him and was able to assist counsel, and that his counsel was thoroughly acquainted with his client's rights under the law of insanity as it existed at the time of the guilty plea, as well as those rights now available under the mental responsibility act, Chapter 552, V.A.M.S.

Appellant's authorities and subsequent cases have been thoroughly discussed in recent cases in which relief has been denied under circumstances similar to those present in this case.

In Miller v. State, 498 S.W.2d 79 (Mo. App.1973), the defendant requested and received a mental examination. It showed that he was not suffering from any mental disease or defect and that he had the capacity to understand the charges and proceedings and to assist in his defense. His argument, *too,* was that his guilty plea should be set aside for failure of the court to accord a hearing on his competency, *sua sponte.* In denial of the argument the court held: "The court is not required to conduct a competency hearing *sua sponte* in the absence of circumstances which render suspect the psychiatric opinion which has certified an accused fit to proceed. * * * The suspicion or actual presence of some degree of mental illness or need for psychiatric treatment does not equate with incompetency to stand trial * * * and does not require the *sua*

*sponte* hearing under Pate v. Robinson * * * if the accused is not hindered in understanding the proceedings or in assisting counsel * * *." 498 S.W.2d l.c. 85. Similarly, in State v. Rand, 496 S.W.2d 30 (Mo.App.1973), defense counsel requested a mental examination of defendant because of his observations of his client and his medical background. The trial court denied the request. In affirming, the appellate court recognized the test to determine competency to stand trial of Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), i. e., whether the accused had sufficient present ability to consult with his counsel with a reasonable degree of rational understanding and whether he had a rational as well as factual understanding of the proceedings against him. The court determined that no facts had been presented to support counsel's opinions and suspicions that defendant was incompetent and, therefore, there could be no reasonable doubt in the mind of the court that defendant was competent to proceed. In McCormick v. State, 463 S.W.2d 789 (Mo.1971), where the findings of the psychiatric examination showed defendant to be mentally fit to proceed, appellant could not urge reversal on the ground he was denied a hearing on his competence. See also Newman v. State, 481 S.W.2d 3 (Mo.1972); Newbold v. State, 492 S.W.2d 809 (Mo.1973); Jones v. State, 471 S.W.2d 223 (Mo.1971); Jones v. Swenson, 469 F.2d 535 (8th Cir. 1972); Anderson v. State, 493 S.W.2d 681 (Mo.App.1973); United States v. Maret, 433 F.2d 1064 (8th Cir. 1970).

Accordingly, there was no reason for the trial court to hold a hearing on defendant's competency simply because his attorney sought a mental examination to assist him in determining whether his client had a defense of insanity to his otherwise confessed rape. Such did not create the requisite *bona fide* doubt of Pate v. Robinson, supra, and the report shows defendant's competency to stand trial.

Appellant contends (II) that the defendant did not receive effective assistance of counsel on the issue of his mental competency to stand trial for the reason counsel did not insist upon additional mental examinations and a separate trial to determine defendant's competency, in violation of his constitutional rights.

Appellant, again citing Brizendine v. Swenson, supra, argues that counsel's satisfaction with his client's competency to stand trial without a hearing does not satisfy due process requirements.

Again it is noted that in Brizendine v. Swenson defense counsel was unaware of his client's rights under the mental responsibility act; whereas Mr. Eagan was aware of the law governing sanity defenses and fitness to proceed.

There is evidence here to show that Mr. Eagan had his client examined and was satisfied of the lack of a defense of insanity and of a fitness to plead. He could communicate with his client and believed his client understood his advice and counseling. He was aware of the confession and its voluntariness (as ultimately determined in State v. Davis, 438 S.W.2d 232, supra). He interviewed witnesses, consulted with his client and the client's family. He engaged in plea bargaining, achieving success to his client's satisfaction and possible salvation from the death penalty. His total performance shows him to have labored hard and effectively for his client. The failure, if so, to discuss defendant's fitness and competency to proceed with the court is not a dereliction of duty where the evidence on the question is persuasive that defendant was competent to proceed. As said in Griggs v. State, 479 S.W.2d 478, 480 (Mo.1972): "If movant is to convict his counsel of ineffective representation in this respect, he is required to show that there was some basis for questioning the report." See also In re Hawley, 67 Cal.2d 824, 63 Cal.Rptr. 831, 433 P.2d 919 (banc 1967), where counsel advised his client to plead

guilty to murder in order to obtain a life sentence instead of possible death penalty. It was shown that counsel was aware of the facts and of the law since he had his client undergo psychiatric examination. The court held that since the attorney was not ignorant of a crucial defense, had not failed to investigate the facts and law, and had consulted with his client about their bearing on his case, there was no ineffective assistance of counsel.

■ In his final effort to set aside this judgment of conviction and sentence to 99 years' imprisonment imposed upon his plea of guilty to forcible rape, appellant asserts: (1) that if he had received a death sentence it would have constituted cruel and unusual punishment in violation of his constitutional rights under Furman v. Georgia, supra; and (2) his plea of guilty was induced by fear of cruel and unusual punishment, i. e., the death penalty, and it was, therefore, involuntary and its receipt in violation of his constitutional rights under Furman v. Georgia, supra.

The answer to the first assertion is obvious: Defendant did not receive the death penalty and, therefore, it is not necessary to consider whether, had he received it, it would have been an unconstitutional cruel and unusual punishment.

With respect to the second assertion, it must be recognized that the death penalty was a lawful penalty at the time of defendant's guilty plea, and its assessment in the circumstances of this case was a distinct possibility. Also, the evidence shows that defendant was aware of the force of his confession, the failure to establish the defense of insanity, the knowledge that the State would seek the death penalty, the knowledge that it had been assessed in a recent similar case, and the benefits of counsel in advice and in seeking a lesser penalty. In such circumstances, it may not be said that the defendant was so gripped by the spectre of the death penalty that he could not weigh the advantages of pleading guilty for a term of years as opposed to going to trial without favorable witnesses or defense and with a conclusive confession. He could readily see his chances of acquittal were slim and that a plea could serve to his advantage. In Brady v. United States, 397 U.S. 742, 751, 90 S.Ct. 1463, 1470, 25 L.Ed.2d 747 (1970), the supreme court declined to hold "that a guilty plea is compelled and invalid * * * whenever motivated by the defendant's desire to accept the certainty or probability of a lesser penalty rather than face a wider range of possibilities extending from acquittal to conviction and a higher penalty authorized by law for the crime charged." See also North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); Skaggs v. State, 476 S.W.2d 524 (Mo.1972); Goodloe v. State, 486 S.W.2d 430 (Mo. 1972); Beeman v. State, 502 S.W.2d 254 (Mo.1973).

Note also, with respect to the application of Furman v. Georgia, that "a voluntary plea of guilty intelligently made in the light of the then applicable law does not become vulnerable because later judicial decisions indicate that the plea rested on a faulty premise." Brady v. United States, supra, 397 U.S. l.c. 757, 90 S.Ct. 1463, 1473, 25 L.Ed.2d 747.

Judgment affirmed.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

BARDGETT, P. J., HOLMAN, J., and WELBORN, Special Judge, concur.

SEILER, J., not sitting.